UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 07-4306(DSD/JJG)

R & D Financial Solutions, Inc.,
d/b/a R & D Technologies, Inc.,
a Minnesota corporation; Dan
Pullis, individually; and
Robert Maki, individually,

        Plaintiffs.

v.

        **FINDINGS OF FACT,**
        **CONCLUSIONS OF LAW,**
        **ORDER FOR JUDGMENT**

Western Thrift and Loan Corp.,
a Nevada corporation; Columbia
Trust Company, a Nevada
corporation and Homeowners
Lending Corp., a California
corporation,

        Defendants.

    Scott A. Johnson, Esq., Todd M. Johnson, Esq. and Johnson
    Law Group, 10580 Wayzata Boulevard, #250, Minnetonka, MN
    55305, counsel for plaintiffs.

    Shushanie E. Kindseth, Esq., Steven H. Silton, Esq.,
    Thomas P. Kane, Esq. and Hinshaw & Culbertson, 333 South
    Seventh Street, Suite 2000, Minneapolis, MN 55402,
    counsel for defendants.

    R & D Financial Solutions, Inc. (R & D), Dan Pullis and Robert

Maki (collectively, plaintiffs) commenced this diversity action on

October 19, 2007, against Western Thrift and Loan Corp. (Western

Thrift), Columbia Trust Company (Columbia Trust) and Homeowners

Lending Corp., a/k/a Corona Service Center (Homeowners)

(collectively, defendants), alleging breach of contract, promissory

estoppel, conversion, theft of trade secrets, deceptive trade

practice violations, common law copyright infringement, slander and libel, negligent misrepresentation, tortious interference with prospective business advantage (TIPBA), and violation of the Computer Fraud and Abuse Act.

On May 10, 2010, the court granted plaintiffs' motion for default judgment against defendants.  The court ordered an evidentiary hearing to determine the amount of damages and attorneys' fees in this case, pursuant to Federal Rule of Civil Procedure 55(b)(2)(B).  The evidentiary hearing came before the court sitting without a jury on August 24, 2010.  Western Thrift was the only defendant to appear.  After two days of trial, testimony and argument, the receipt by the court of exhibits, post-trial briefs and proposals by the parties, the court makes the following:

FINDINGS OF FACT

**I.   The Parties**

1.   R & D is a Minnesota corporation.  Compl. ¶ 12.[1]

2.   Maki is R & D's co-owner and chief executive officer. Tr. 46:9.[2] He has worked as a licensed mortgage broker since 1994. Tr. 46-47.

---

[1] The complaint is submitted as Plaintiffs' Exhibit 37.

[2] "Tr." refers to the transcript of the August 24, 2010, hearing.

3.    Pullis is R & D's co-owner and chief financial officer. Tr. 188: 20-24.  He has been in the field of "E-commerce" and website creation since 1997.  Tr. 189:22-190:13.

4.    Western Thrift, a Nevada thrift and loan corporation, and Columbia Trust, a Nevada mortgage corporation, provide internet lending services. Compl. ¶¶ 3, 4.

5.    Mortgage brokers (Associates) contract with Western Thrift and Columbia Trust to originate mortgage loans through Associate programs.  Id. ¶¶ 3, 4.

6.    Homeowners is a California corporation that contacts Associates to secure contracts for lenders.  Id. ¶ 6.

## II.  The Agreement

7.    In or around September 1998, Western Thrift and Homeowners executed a written service agreement (Service Agreement).  Def.'s Ex. 435.  Western Thrift "desire[d] to engage [Homeowners] to set up a multi-state loan origination, processing, closure and funding of mortgage loans [sic] in several states .... Under the control of [Western Thrift], [Homeowners] operating as a department of [Western Thrift], shall have the responsibility for the direction, management and conduct of the Mortgage Loan Business." Id. ¶¶ 1.2, 6.1.

8.    The agreement could be terminated upon 30 days notice, but Western Thrift and Homeowners "agree[d] to provide at least four months notice to each other." Id. ¶ 9.2.

9.   In 2004, Homeowners approached Maki and Pullis to develop customized software and an internet-based hosting solution for Associates to originate and process mortgage loans.  Compl. ¶ 9.

10.  In 2004, Maki built a "proof of concept," Tr. 55:3-5, and "showcas[ed] the product," Tr. 151:16-20.

11.  Around January 2005, Maki and Pullis "got the go ahead ... to start the project."  Tr. 151:19-20.

12.  The parties did not enter into a formal contract.  Compl. ¶ 11.  Homeowners expressly promised that Maki and Pullis would be the exclusive provider of the "[i]nternet loan originating and processing platform for all" Western Thrift and Columbia Trust's Associates nationwide if Maki and Pullis would acquire, develop, host and maintain the software.  Id.  Homeowners "further promised that Maki and Pullis ... would have the continuous and exclusive right to host data for the Associates so long as the software performed."  Id.

13.  R & D reasonably believed that Homeowners was acting as an agent for Western Thrift and Columbia Trust.  Tr. 78-79, 84-85; Compl. Ex. A.[3]  In reliance on Homeowners' promise, Maki and Pullis formed R & D.  Compl. ¶ 12.

---

[3] Complaint Exhibit A is submitted as plaintiffs' Exhibit 5.

14.  Maki immediately began building websites.  Tr. 55:8-10. Maki spent about two to three hours building each website.  Tr. 55:10-12.  It took several weeks for the technology platform to become operational.  Tr. 56:11-25.

15.  Encompass is a loan origination software application that allows a loan officer to enter a borrower's data and print forms for the borrower to sign.  Tr. 49.

16.  R & D purchased two licenses to use the Encompass software, Tr. 58:15-23, one for Western Thrift and the other for Columbia Trust, Tr. 78:6-7.  R & D purchased the first license before it started doing business with Western Thrift.  Tr. 77:25-78:7.

17.  Using the Encompass software, R & D created a system to manage thousands of users and create "customized user groups, processing groups, [and] loan officer groups with different position levels for each user."  Tr. 175:5-8.  Maki entered the "entire user system" into Encompass including "[t]he 6,000 users [who] were on the system, their user I.D.s, their passwords, their permission levels, which groups they would belong to, [and] whether they belonged to a processing group or a loan officer group."  Tr. 175:18-22.

18.  "ePass" is a internet portal built into the Encompass application.  Tr. 50:21-22.  There are third-party services available in the ePass network.  Tr. 50:24.  Maki embedded an internet site in the ePass system. Tr. 51:2-3.

19.  A portal is a link that opens up a web page inside the Encompass application that includes an account representative's contact information and a document library number that would have "anything from product flyers to any kind of announcement that the account rep would want to convey to the Associates."  Tr. 51:20-52:3.  The portal contained all the information necessary to complete the transaction with the lender.  Tr. 53:1-2.

20.  Maki created a separate web portal for each of the lenders for whom Western Thrift and Columbia Trust would broker mortgages. Tr. 51-52.  In total, Maki created more than 160 separate web sites.  Tr. 52:19-22.

21.  Sharepoint is a Microsoft program.  Tr. 47:8-9.  R & D bought a license to use Sharepoint, Tr. 66:6-7, and used the program to create a website to disseminate documents and policies to Associates, Tr. 49:7-9.

22.  Columbia Trust began using the services of R & D in 2005. Tr. 56:12-16.  Western Thrift began using the services of R & D in 2006.  Tr. 66:8-14.

23.  To become an Associate, an individual first signed an Associate Service Agreement (Associate Agreement) with Homeowners and Western Thrift.  Compl. Ex. A.

24.  The Associate Agreement stated that it was entered into "for the benefit of Western Thrift & Loan ('WTL'), through its affiliate, Homeowners Lending." Id.  The Associate Agreement was signed by Homeowners President Gerald Sandler, under the caption "Homeowners Lending Corporation, An Affiliate of Western Thrift & Loan." Id. at 11.

25.  The Associate Agreement required that "[a]ll loans shall be registered, processed and submitted through [Homeowners'] required Network Loan Origination Software (LOS)." Id. ¶ 1. Associates agreed to use Homeowners' "web functionality to process all loans, record status updates, and otherwise utilize [Homeowners'] designated LOS for all loans." Id. ¶ 12(k).

26.  The Associate Agreement, "Exhibit A: Compensation Schedule," states that Homeowners "utilizes a designated Network Loan Origination Software for all loan originations.  All Associates are required to utilize this system and maintain an active account with [Homeowners'] REQUIRED VENDOR.  Fees vary and are payable directly to vendor." Id. at 12.

27.  The Associate Agreement, "Exhibit B: Service Standards Quality Control," states that "Associate shall enter into an Agreement and utilize [Homeowners'] internet-based electronic Loan

Origination System (LOS) for the processing, submission, and tracking of all loans. Associate shall not originate [Western Thrift] loans using any other LOS platform." _Id._ at 14.

28. The Associate Agreement contains a "Non-Modifiability" clause that states that the "Agreement and attached Commission Schedule constitute the entire Agreement ... [and] may not be amended, modified, waived or changed in any respect except in writing ...." _Id._ ¶ 28.

29. A prospective Associate must submit to Homeowners a signed Associate Agreement, an Associate Application (Application) and various other documents. The Application stated that applicants must submit a "$250 one-time LOS set-up fee, _payable to our vendor_, **_R & D Technologies_**." _Id._

30. In addition to the initial $250 fee, Associates paid R & D $300 per quarter, charged as $100 per month, via automatic credit card billing. Tr. 192:1-8; Pls.'s Ex. 6.

31. From January 2005 to April 2007, R & D experienced a net growth of approximately eight Associates per month. Tr. 184-185. In April 2007, approximately 600 Associates were R & D customers. Tr. 153:18-20. There were between 5,000 and 6,000 activated user accounts. Tr. 154:4-6.

32. In November 2005, Homeowners informed R & D that it was receiving "lots of complaints" about the speed of the system. Def.'s Ex. 115. In August 2006, Homeowners complained about the

system's "poor upload speed," additional fees, and other problems. Def.'s Ex. 134.

**III.  The Dispute**

33.  In or around late March 2007, Homeowners told R & D that regulators were demanding that R & D's service move in-house. Compl. ¶ 17; Tr. 127-28.  R & D later learned that this was false. Compl. ¶ 18; Tr. 145:2-4.

34.  Under the belief that Homeowners had to bring the services in-house, R & D negotiated a preliminary agreement with Homeowners to transfer R & D's Encompass System to Homeowners. Compl. ¶ 19; Tr. 145:9-19; Def.'s Ex. 175.  Under the agreement, R & D would be compensated for transferring the Encompass system within 30 days.  Def.'s Ex. 175.

35.  On or around Good Friday 2007, Cari Story, an officer at Homeowners, informed R & D that Homeowners would not sign the agreement.  Tr. 146:3-6; 254:2-5.  Story directed R & D to transfer the data stored on Encompass anyway.[4]  Tr. 148:5-8.

36.  R & D refused to transfer the data because Homeowners refused to sign the contract.  Tr. 147:9-13.  R & D believed it had a legal obligation to maintain the data on its secure system.  Tr. 82.

---

[4] The data consisted of "over 50,000 loan applications, credit reports, [and] private customer data."  Tr. 82:16-17.

37.  On or around Good Friday 2007, R & D discovered that Homeowners was "exporting files from [R & D's] system onto [Homeowners'] system" including "the hierarchy that [R & D] had set up for Encompass, all of the user accounts ... that [R & D] had created, and were copying and pasting that user setup from [R & D's] setup onto [Homeowners'] setup."  Tr. 160-161.  The information included "confidential Associate information and custom settings, adaptations, and other intellectual property designed by R & D."  Compl. ¶ 20.

38.  When R & D discovered Homeowners' conduct, it changed Homeowner's passwords and restricted access to the system.  Tr. 83: 15-18.  However, Homeowners successfully downloaded R & D's technological platform, including the 160 websites R & D created to process loans.  Tr. 162-63.

39.  On or around April 17, 2007, Homeowners instructed Western Thrift Associates to "immediately" safeguard their current Encompass data and change to a new server.  Def.'s Ex. 206. Homeowners further instructed, "[f]or assistance, contact [Homeowners] .... Do not contact R & D Technologies."  Id.

40.  On July 8, 2007, Story emailed ernesto.co@westernthrift.net and stated that R & D used "unscrupulous business practices."  Compl. ¶ 23; Def.'s Ex. 300; Tr. 148:6.

41.   In January 2008, Homeowners and Western Thrift terminated their Service Agreement.  Tr. 299.  Western Thrift gave Homeowners four months to close remaining loans and terminate pending business.  Id.

**IV.   Income**

42.   From January 2005 through March 2007, R & D earned $224,223.52 in net ordinary income.  Pls.'s Ex. 1, at 3.   From January 2005 through December 2005, R & D earned $20,430.98 in net ordinary income.  Pls.'s Ex. 2, at 2.   From January 2006 through December 2006, R & D earned $154,445.03 in net ordinary income. Pls.'s Ex. 3, at 2.   From January 2007 through March 2007, R & D earned $46,864.86 in net ordinary income.[5]  Pls.'s Exs. 7-9;  Tr. 196.

43.   If R & D continued to have a net gain of eight associates per month, it would have earned an estimated net income of $613,598.13 for calendar year 2007.  Tr. 199-200.

44.   In 2007, R & D had the following monthly total expenses: January,  $74,082.16  (payroll  expense:[6]  $39,617.60);  February,

---

[5] By the court's calculation, the sum of net ordinary income from January to December 2005, January to December 2006, and January to March 2007 equals $221,740.87, not $224,223.52 as calculated by plaintiffs.  However, because the difference is nominal and this issue was not raised at trial, the court accepts plaintiffs' calculation.

[6] Profit and Loss statements from January 2007 to May 2008 tally the "Total Payroll Expenses." Profit and Loss statements from July 2008 to January 2008 refer to the "Payroll expenses."

$29,119.56 (payroll expense: $21,480.47); March, $44,580.45 (payroll expense: $28,344.77); April, $48,499.96 (payroll expense: $6,704.92); May, $10,645.44 (payroll expense: $2,680.29); June, $5,842.01 (payroll expense: $2,655.94); July, $12,966.62 (payroll expense: $2,661.42); August, $25,484.40 (payroll expense: $3,942.11); September, $22,913.76 (payroll expense: $2,642.60); October, $16,276.65 (payroll expense: $2,115.12); November, $3,402.55 (payroll expense: $608.01); December, $9,768.87 (payroll expense: $1,490.75). Pls.'s Exs. 7-18.

45. In 2008, R & D had the following monthly total expenses: January, $7,051.01 (payroll expense: $835.44); February, $2,888.03 (payroll expense: $977.15); March, $7,402.59 (payroll expense: $619.17); April, $5,662.11 (payroll expense: $876.65); May, -574.80 (payroll expense: $248.09); June, $362.73 (payroll expense: N/A); July, $1,133.57 (payroll expense: $59.00); August, $1,704.18 (payroll expense: $59.00); September, $4,653.32 (payroll expense: $59.00); October, $2,375.32 (payroll expense: $69.00); November, $1,725.96 (payroll expense: $69.00); December, $11,501.61 (payroll expense: $69.00). Pls.'s Exs. 19-30.

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over this case under 28 U.S.C. § 1332.

## I.   Liability

2.   "[W]hen a default judgment is entered, facts alleged in the complaint may not be later contested." Marshall v. Baggett, 616 F.3d 849, 852 (8th Cir. 2010) (citation omitted).   However "it remains for the [district] court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." Id. (citation and internal quotation marks omitted).

### A.   Agency

3.   "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." N. v. McGraw-Edison Co., 542 F.2d 1336, 1343 (8th Cir. 1976) (citation omitted).

4.   A principal is bound by acts of his agent carried out within the agent's actual or apparent authority. See Powell v. MVE Holdings, Inc., 626 N.W.2d 451, 457 (Minn. Ct. App. 2001).

5.   Apparent authority, requires that (1) the principal held the agent out as having authority, (2) third parties had actual knowledge that the agent was held out by the principal as having such authority or had been permitted by the principal to act on its behalf, and (3) "proof of the agent's apparent authority must be found in the conduct of the principal, not the agent." Hockemeyer v. Pooler, 130 N.W.2d 367, 375 (Minn. 1964).

13

6.   An agent may bind the principal to a contract.   See Kohagen-Mendenhall Co. v. Joyce, 21 N.W.2d 232, 234 (Minn. 1945).

7.   A principal is not liable for the unauthorized intentional tort of its agent.   Semrad v. Edina Realty, Inc., 493 N.W.2d. 528, 535 (Minn. 1992).

8.   The release of the agent releases the principal from vicarious liability.   Booth v. Gades, 788 N.W.2d 701, 707 (Minn. 2010).

9.   Homeowners was Western Thrift's agent.

10.   Homeowners acted within its actual or apparent authority in conduct giving rise to this dispute.

11.   Homeowners and Western Thrift's agency relationship terminated in January 2008 when they terminated the Service Agreement.

**B.   Breach of Third-Party Beneficiary Contract**

12.   Although a stranger to a contract generally acquires no rights under the contract, "an exception exists if a third party is an intended beneficiary of the contract." Hickman v. SAFECO Ins. Co. of Am., 695 N.W.2d 365, 369 (Minn. 2005).

13.   A third party may recover as an intended beneficiary by satisfying either the "intent to benefit" or "duty owed" test. Cretex Cos. v. Constr. Leaders, 342 N.W.2d 135, 139 (Minn. 1984).

14.   Under the "intent to benefit" test "the circumstances must indicate that the promisee (here [defendant]) intends to give the

14

beneficiary (here [plaintiffs]) the benefit of the promise."
Hickman, 695 N.W.2d at 370.  In ascertaining the parties' intent to
benefit a third party, the court reads the contract "in light of all
the surrounding circumstances."  Id.  The absence of a party's name
in the contract does not preclude a finding of intent to benefit.
Id.

15.  R & D was an intended third-party beneficiary of the
Associate Agreement.

16.  An intended beneficiary's rights vest when the third party
accepts the agreement or detrimentally relies upon it.  Minn. Office
Plaza, LLC v. Target Stores, Inc., No. A06-1320, 2007 WL 2363875,
at *8 (Minn. Ct. App. Aug. 21, 2007) (citation and internal
quotation marks omitted); see also Morstain v. Kircher, 250 N.W.
727, 728 (Minn. 1933).

17.  R & D's third-party beneficiary rights vested.

18.  Once a third-party beneficiary's rights are vested, the
contract cannot be modified without the beneficiary's consent.  See
Minn. Office Plaza, 2007 WL 2363875 at *8; Morstain, 250 N.W. at
728.

19.  Homeowners breached the contract and violated R & D's
third-party beneficiary rights in April 2007 when it unilaterally
modified the Associate Agreement by instructing Associates to change
to a new server.

20.  Western Thrift is liable for Homeowners' breach.

### C.    Promissory Estoppel

21.    Promissory estoppel requires that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice.  See Olson v. Synergistic Techs. Bus. Sys., Inc., 628 N.W.2d 142, 152 (Minn. 2001).

22.    Homeowners' promise was clear and definite.

23.    Homeowners intended to induce plaintiffs' reliance, and such reliance occurred.

24.    The promise must be enforced to avoid injustice.

25.    Western Thrift is liable for Homeowners' promise.

26.    Promissory estoppel only applies where no actual contract exists.  See Ruud v. Great Plains Supply, 526 N.W.2d 369, 372 (Minn. 1995).   Because R & D has contractual rights as a third-party beneficiary, it cannot recover under promissory estoppel.

### D.    Slander and Libel

27.    To establish slander or libel, plaintiff must show that defendant made a false statement, communicated it to a third party, and that it tended to harm plaintiff's reputation.  See Richie v. Paramount Pictures Corp., 544 N.W.2d 21, 25 (Minn. 1996).  Slander affecting one's trade or business is "actionable without any proof of actual damages."  Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980).  The communication must cause enough harm to lower the community's estimation of plaintiff or deter others from

dealing with him.  <u>Weissman v. Sri Lanka Curry House, Inc.</u>, 469 N.W.2d 471, 473 (Minn. Ct. App. 1991).

28.  Homeowners is liable for slander for accusing R & D of "unscrupulous business practices."

29.  Homeowners was not acting within the scope of its agency relationship with Western Thrift when it committed this tort. Therefore, Western Thrift is not liable.

## II.  No Liability

### A.  Conversion

30.  To succeed on a conversion claim, plaintiff must prove that it has a property interest, and defendant deprived it of that interest.  <u>In re Air Transp. Excise Tax</u>, 37 F. Supp. 2d 1133, 1143 (D. Minn. 1999) (citation omitted).  The deprivation must have no legal justification.  <u>See</u> <u>Larson v. Archer-Daniels-Midland Co.</u>, 32 N.W.2d 649, 650 (Minn. 1948).  Conversion is an intentional tort. <u>See</u> <u>Herrman v. Fossum</u>, 270 N.W.2d 18, 20 (Minn. 1978).

31.  R & D had a property interest in its technology platform, including the Encompass hierarchy and user accounts.

32.  R & D failed to show that Homeowners deprived R & D of its property interest.  Therefore, the facts as pleaded do not support liability on this claim.

### B.  TIPBA

33.  To state a claim for TIPBA, plaintiff must show that defendants intentionally and improperly interfered with its

prospective business relations by (1) inducing or otherwise causing a third person not to enter into or continue such a relation or (2) preventing plaintiff from acquiring or continuing a business relation. See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632 (Minn. 1981).

34. A party cannot interfere with its own contractual relationships. Bouten v. Richard Miller Homes, Inc., 321 N.W.2d 895, 901 (Minn. 1982). Homeowners action of directing Associates to switch to a different server and refrain from contacting R & D constitutes a breach of contract. Therefore, there is no liability under TIPBA for this conduct.

35. To the extent that R & D bases this claim on the defamatory statement, the claims are duplicative. See Wild v. Rariq, 234 N.W.2d 775, 793 (Minn. 1975); Dunham v. Opperman, No. A06-07, 2007 WL 1191599, at *6-7 (Minn. Ct. App. Apr. 24, 2007). Moreover, the facts as pleaded fail to establish liability on this claim.

### C. Theft of trade secrets

36. The Minnesota Uniform Trade Secrets Act protects information from misappropriation through improper acquisition, disclosure, or use of a "trade secret." Minn. Stat. § 325C.01, subdiv. 3.

37. "[A] trade secret is information that: (1) is not generally known or readily ascertainable, (2) has value as a result

of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 899 (8th Cir. 2005); see also Minn. Stat. § 325C.01, subdiv. 5.

38. The facts as pleaded do not support liability on this claim.

### D.   Deceptive Trade Practices

39. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person disparages the goods, services, or business of another by false or misleading representation of fact. Minn. Stat. § 325D.44, subdiv. 1(8).[7]

40. The sole remedy for this claim is an injunction against the deceptive trade practice. See id. § 325D.45, subdiv. 1. Therefore, this claim is moot.

### E.   Common Law Copyright Infringement

41. To establish copyright infringement, plaintiff must show that (1) it owned a valid copyright and (2) the defendant copied the work's original elements. See Mulcahy v. Cheetah Learning LLC, 386 F.3d 849, 852 (8th Cir. 2004) (citation omitted).

42. The facts as pleaded do not support liability on this claim.

---

[7] The complaint erroneously cites Minn. Stat. § 335E.44, subdiv. 1(8). See Compl. ¶ 39.

19

### F.   Negligent Misrepresentation

43.   A person makes a negligent misrepresentation when (1) in the course of his business, (2) he supplies false information for the guidance of others in their business, (3) another justifiably relies on the information, and (4) the person making the representation fails to exercise reasonable care in communicating the information.   See Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 369 (Minn. 2009) (citation omitted).

44.   A defendant is liable only if it owes the plaintiff a duty of care.   M.H. v. Caritas Family Servs., 488 N.W.2d 282, 287 (Minn. 1992).   No duty of care exists when sophisticated parties negotiate at arm's length unless the parties have a special relationship. Smith v. Woodwind Homes, Inc., 605 N.W.2d 418, 424-25 (Minn. Ct. App. 2000).

45.   R & D and defendants are sophisticated parties who negotiated at arm's length.   No special relationship exists. Therefore, defendants did not owe R & D a duty of care.

46.   The facts as pleaded do not support liability on this claim.

### G.   Computer Fraud and Abuse Act

47.   Plaintiffs allege violations of the Computer Fraud and Abuse Act, and cite 18 U.S.C. § 1030(2)(C) and (5)(A)(iii).   This citation is erroneous and fails to state a claim.   "A party cannot bring a civil action [under the CFAA] based on provisions other than

§ 1030(a)(5)." Hot Stuff Foods, LLC v. Dornbach, 726 F. Supp. 2d 1038, 1045 (D. Minn. 2010) (quoting Cenveo Corp. v. CelumSolutions Software GMBH & Co. KG, 504 F. Supp. 2d 574, 580 (D. Minn. 2007)).

48. The facts as pleaded do not support liability on this claim.

## IV.  Damages

### A.  Against All Defendants

#### i.  Lost Profits

49. Plaintiffs have the burden of proving, by a preponderance of the evidence and to a reasonable certainty, the amount of damages. See Pietrzak v. Eggen, 295 N.W.2d 504, 507 (Minn. 1980). Although plaintiffs cannot recover for "damages which are remote, speculative, or conjectural ... it is not necessary that the evidence be unequivocal or that it establish future damages to an absolute certainty." Id.

50. Expectation damages are available to a party recovering for breach of contract. Logan v. Norwest Bank Minn., N.A., 603 N.W.2d 659, 663 (Minn. Ct. App. 1999) (citation omitted). Expectation damages attempt to place the plaintiff in the same position as if the breaching party had honored the contract. Id.

51. Plaintiffs are entitled to expectation damages from April 2007 through March 2008. As of April 2008, there were no remaining Associates. Tr. 299.

52.   Lost profits generally are measured as lost net profits.
See Cardinal Consulting Co. v. Circo Resorts, Inc., 297 N.W.2d 260,
269 (Minn. 1980).  A "plaintiff may be awarded damages on the basis
of its anticipated gross profits if the breach has not significantly
reduced overhead."  Id.

53.   The breach of contract in April 2007 significantly reduced
R & D's overhead and expenses.  See Facts ¶¶ 44-45.  Accordingly,
R & D is not entitled to recover lost gross profits, but can recover
lost net profits.

54.   Based on R & D's net income in the first quarter of 2007
($46,864.86 for January through March 2007), R & D could reasonably
expect to earn $187,459.44 in net income from April 2007 through
March 2008.  R & D actually earned $88,507.92 in net income from
April 2007 through March 2008.  See Pls.'s Ex. 10-21.  Therefore,
plaintiffs are entitled to $98,951.52 in damages, for which
defendants are jointly and severally liable.

### ii.  Attorneys' Fees

55.   The district court has wide discretion in determining the
amount of an attorneys' fee award and the amount of the fee must be
determined on the facts of each case.  Hensley v. Eckerhart, 461
U.S. 424, 429, 437 (1983); Rogers v. Kelly, 866 F.2d 997 (8th Cir.
1989).  The Eighth Circuit "give[s] great deference to the district

courts on fee matters having to do with services performed before them." Griffin v. Jim Jamison, Inc., 188 F.3d 996, 997 (8th Cir. 1999).

56. In this three-year litigation, defendants' contumacious disregard of court orders, dilatory behavior and failure to appear for depositions and court conferences warrant an award of attorneys' fees.

57. In determining the amount of a reasonable fee, the court considers several factors including:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Hensley, 461 U.S. at 430 n.3.

58. Plaintiffs' attorneys' fee statements contain hourly rates ranging from $160 to $325 without explanation for the disparities. The court finds $260 to be a reasonable hourly rate. The court finds 579.93 hours reasonable.

59. Therefore, defendants are jointly and severally liable to plaintiffs for $150,781.80 in attorneys' fees.

### B.   Against Homeowners

60.   Plaintiffs are entitled to recover damages for slander.

61.   Homeowners is liable to plaintiffs in the amount of $15,000 for slander.


### ORDER FOR JUDGMENT

Pursuant to the foregoing Findings of Fact and Conclusions of Law, **IT IS ORDERED AND ADJUDGED** that:

1.   Defendants are jointly and severally liable to plaintiffs in the amount of $98,891.52;

2.   Defendants are jointly and severally liable to plaintiffs for costs and attorneys' fees in the amount of $150,781.80.

3.   Homeowners is liable to plaintiffs in the amount of $15,000.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   February 18, 2011

                              s/David S. Doty
                              David S. Doty, Judge
                              United States District Court

24